UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

| | Court File No. 03-4870 DWF/JSM |
|---|---|
| Wan Chen Wu a/k/a Lilian Wu, a minor, by her mother and natural guardian Pi Yu Tien and by her father and natural guardian, Ju Peng Wu, and Pi You Tien, individually and Ju Peng Wu, individually, | |
| | **DEFENDANT GREG PAINE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| vs. | |
| Shattuck-St. Mary's School, a Minnesota corporation, and Greg Paine, | |
| Defendants. | |

## INTRODUCTION

Plaintiff Wan Chen Wu a/k/a Lilian Wu ("Plaintiff"), age sixteen, sustained a head injury, on January 16, 2003, while voluntarily involved in an indoor golf class at Shattuck St. Mary's School ("SSMS").   Plaintiff was injured when she chose to leave her hitting mat and enter the driving range inside the netting system to retrieve golf balls while other students in the class were still practicing their golf swing.  While retrieving golf balls inside the driving range of the net, Plaintiff was hit in the head by a golf ball struck by fellow student Luke Sorenson ("Sorenson").

Plaintiff voluntarily chose to enter the driving range despite her knowing of the danger of serious injury in being struck by a high speed golf ball.  Plaintiff had several opportunities to avoid the risk of injury, yet she voluntarily encountered the risk of injury. Plaintiff's actions demonstrate that Defendant Greg Paine ("Paine"), the golf instructor,  is entitled to summary judgment based on the doctrine of primary assumption of the risk.

Accordingly, Paine respectfully seeks an Order from the Court granting his Motion for Summary Judgment and dismissing Plaintiff's Complaint with prejudice.

In the alternative, Paine seeks partial summary judgment on Plaintiff's joint enterprise claim. Paine is entitled to summary judgment on this cause of action because there is no evidence that (1) Paine and SSMS ever had a mutual understanding for a common purpose; or (2) Paine ever had an equal right to a voice in the direction and control of the means used to carry out any common purpose.

## LEGAL ISSUES

1.      Does the doctrine of primary assumption of the risk bar Plaintiff's recovery for a head injury she sustained when she voluntarily decided to leave her position of safety on the golf mats and enter the driving range inside the net to retrieve golf balls as other students were still practicing their golf swing while knowing the danger of injury involved in being struck by a golf ball hit at a high speed?

2.      Whether Plaintiff's joint enterprise claim survives given the lack of evidence of either (1) a mutual understanding for a common purpose between SSMS and Paine; or (2) an equal right to a voice in the direction and control of the means used to carry out any common purpose by Paine.

## STATEMENT OF UNDISPUTED FACTS

### I.      The Golf Class at SSMS

Paine was hired by SSMS Head Master Dennis Brown to teach an elective winter golf class at the school. (March 10, 2004 Deposition of Greg Paine, at pp. 13-15, attached as Exhibit 1 to the Affidavit of Daniel A. Haws, hereinafter referred to as "Haws Aff.") He was paid $1,500 by SSMS at the conclusion of the golf class. (Id. at p. 55)

SSMS offered the golf class to its students for the first time during the winter trimester of 2002 to 2003. (May 24, 2004 Deposition of John Sumner, at pp. 17-18 & 25, attached as Ex. 2 to Haws Aff.)  The idea to hold an elective golf class originated with Head Master Brown.  (Id. at pp. 26-27; see also June 2, 2004 Deposition of Dennis Brown, at pp. 25 & 35, attached as Ex. 3 to Haws Aff.)

Head Master Brown considered the golf class to be an enrichment course that would be a beneficial opportunity for SSMS students.  (Brown Depo. at pp. 15-17)  According to Head Master Brown, SSMS attempted to find classroom opportunities to round out students' learning and developmental experience.  (Id. at p. 18)  Head Master Brown testified that for boarding students, like Plaintiff, SSMS attempted to provide developmental experiences that parents would normally provide for their children in order to help round out the students' education.  (Id. at pp. 18-20)  Mr. Sumner, SSMS's Athletic Director, agreed that Head Master Brown instituted the golf class because he was interested in giving students elective opportunities outside the core curriculum.  (Sumner Depo. at pp. 5, 20 & 26, attached as Ex. 2)

SSMS, through Head Master Brown, hired Paine to teach the class because he was a qualified teaching pro at the local golf course.  (Brown Depo. at pp. 26 & 48; see also Sumner Depo. at pp. 29-32, attached as Ex. 2 to Haws Aff.)  SSMS and Paine had a verbal agreement, but not a written contract.  (Sumner Depo. at pp. 51-52)

After Head Master Brown and Athletic Director Sumner agreed to have an indoor golf class, they chose to hold the class in the basement gymnasium because it was the logical space.  (Id. at pp. 32-33; see also Brown Depo. at pp. 51-52)  Paine also worked with Headmaster Brown and Athletic Director Sumner in deciding that the golf class would take place in the basement gymnasium.  (Paine Depo. at p. 23, attached as Ex. 1 to Haws Aff.)  The school had a previous net in the gymnasium designed for baseball and softball.

(Id. at p. 26)  According to Paine, SSMS wanted the golf class to take place in the same netting system as baseball and softball.  (Id. at pp. 26 & 44-45; see also Sumner Depo. at pp. 44-45 & 64, attached as Ex. 2 to Haws Aff.)  As such, Paine was asked to locate a dual purpose netting system for the school.  (Paine Depo. at pp. 24 & 26, attached as Ex. 1 to Haws Aff.; Sumner Depo. at p. 64, attached as Ex. 2 to Haws Aff.)  Athletic Director Sumner deferred to Paine as to the construction of the dual purpose net.  (Sumner Depo. at pp. 49 & 64, attached as Ex. 2 to Haws Aff.)  Once a net had been selected by Paine, it was approved by Athletic Director  Sumner.  (Id. at p. 65)

Paine also decided the types of balls to use during the golf class.  (Id. at p. 50)  In addition, he decided how to set the mats up inside the netting system.  (Id.)  Head Master Brown had faith in Paine's equipment recommendations.  (Brown Depo. at pp. 53 & 56, attached as Ex. 3 to Haws Aff.)  All of the equipment for the golf class was purchased by SSMS.  (Id. at pp. 30-31 & 33)

Paine taught golf safety to the students participating in SSMS's golf class.  (Paine Depo. at pp. 20 & 31, attached as Ex. 1 to Haws Aff.)  He was also responsible for supervision of the students.  (Id.)

According to Athletic Director Sumner, SSMS supervised the golf class.  (Sumner Depo. at p. 53, attached as Ex. 2 to Haws Aff.)  Athletic Director Sumner went to Paine's class twice weekly for a 15-minute observation visit.  (Id.)  Athletic Director Sumner admits that he had authority to make any changes he saw fit in how Paine was teaching the golf class.  (Id.)  In fact, Sumner agreed that if he wanted any safety modifications made at the facility, he could have directed those changes.  (Id. at p. 57)  In addition to the Athletic Director being able to oversee the coach or physical education teacher, the Head of School had the ability to oversee the activities of the Athletic Director.  (May 24, 2004 Deposition of Nicholas Stoneman, at pp. 17-18, attached as Ex. 4 to Haws Aff.)

SSMS did not ask Paine to prepare any lesson plans for the class.  (Paine Depo. at p. 43)  Paine did not have to file anything with the physical education department or the athletic department either.  (Id. at p. 48)  He did not use any books or course material in teaching the golf class.  (Id. at pp. 43 & 47-48)  He was not provided with a curriculum by SSMS to instruct students.  (Id. at p. 55)  In short, SSMS did not tell Paine how to teach the golf class.  (Id. at p. 66)  Rather, SSMS relied on Paine's expertise in teaching golf to the students.  (Id. at p. 55)

## II.     Plaintiff's Accident

Plaintiff, a citizen of Taiwan, was a full-time student at SSMS in 2002. There is no dispute that she was fluent in English at the time of the accident. (Complaint, dated, August 6, 2003, attached as Ex. 5 to Haws Aff.)  As part of her education, Plaintiff enrolled in a golf class at SSMS.  (Id.)  On or about January 17, 2003, Plaintiff was attempting to retrieve golf balls inside the netted structure when she was struck in the head by a golf ball hit by fellow golf student Sorenson.  (Id.)

## III.    The Lawsuit

Plaintiff sustained a brain injury as a result of being struck in the head by a golf ball. (Id.)  She commenced suit against Paine and SSMS in August 2003 alleging the following causes of action: (1) Breach of Contract against SSMS; (2) Negligence of SSMS; and (3) Negligence of Paine.  (Id.)  The alleged negligence of Paine included his "failure to provide a reasonably safe learning environment/golf class facility;" his "failure to instruct the students in proper safety rules and procedures;" and his "failure to strictly enforce proper safety rules and procedures."  (Id.)

In April 2004, Plaintiffs served an Amended Complaint alleging claims of Agency, Vicarious Liability and Joint Enterprise.  (Amended Complaint, dated April 28, 2004, attached as Ex. 6 to Haws Aff.)  Paine answered the Amended Complaint denying any

negligence on his part.  (Answer of Greg Paine to Plaintiffs' Amended Complaint, dated May 10, 2004, attached as Ex. 7 to Haws Aff.)  Paine also denied the existence of any Joint Enterprise between himself and SSMS.  (Id.)  Finally, he alleged that Plaintiffs' claims were barred by Plaintiff's assumption of risks, dangers or hazards known to her.  (Id.)

Plaintiff has no memory of the golf class or the accident and/or is unable to communicate about the facts of the accident.  (Plaintiffs' Answers to Interrogatories, Nos. 4-11 & 21, dated January 9 & 12, 2004, attached as Ex. 8 to Haws Aff.; see also Plaintiffs' Amended/Supplemental Answers to Interrogatories, No. 21, undated, attached as Ex. 9 to Haws Aff.)[1]

## IV.    Paine's Instructions On Golf Safety

Paine is a member of the PGA, classification A-1, which means that he is a head golf professional at a green grass facility.  (Paine's depo. at p. 8, attached as Ex. 1 to Haws Aff.)  He was hired by SSMS to teach an elective winter golf class.  (Id. at pp. 13-15)  Paine started teaching golf in 1997.  (Id. at p. 16)  Paine had also participated in several internships that were involved with junior programs from 1992 to 1996.  (Id. at p. 17)

Paine testified that when teaching golf to kids nothing is more important than safety. (Id. at p. 19)  Paine provided his students with the following safety rules: (1) make sure

---

[1] In Plaintiffs' Amended/Supplemental Answers to Interrogatories, they expanded upon the claimed negligence of Paine alleging that it included the following: (1) failing to set up a reasonably safe facility for teaching the students golf indoors; (2) failing to investigate or learn the reasonable and customary measures followed at indoor high school golf facilities to provide for the safety of the students; (3) failing to use appropriate whiffle balls or practice balls; (4) failing to supervise and monitor students under his control; (5) failing to establish the correct rule for retrieval of golf balls; (6) failing to enforce his rules for golf ball retrieval; (7) failing to incorporate tee dividers for the protection of the students; (8) failing to utilize golf cages for the protection of the students; (9) negligently providing the students with an inadequate number of golf balls so as to insure that it would be necessary for them to go out in the line of fire several times throughout each class period to retrieve their golf balls; (10) failing to set up the golf tees with an appropriate minimum separation distance; (11) failing to set up a teaching station which would allow him to keep all the students under observation while he was doing individualized instructions; (12) failing to look to determine if anyone was in the hitting area before instructing Sorenson to swing and strike a golf ball; (13) failing to locate the mats and tees close to the baffle net; and (14) failing to properly install the baffle net.  (Id. at No. 12)

nobody is around or in front of you before you swing a club; and (2) do not walk out in front of someone who is hitting golf balls.  (Id. at pp. 21-22 & 31)  He provided these safety rules to all of the students at SSMS.  (Id. at pp. 30-31)

With regard to ball retrieval, Paine instructed the students that everyone was to go out together as a group to retrieve balls or a student could stop the class from golfing while they retrieved balls.  (Id. at pp. 35 & 45)  If the students tried to get a ball while others were still hitting, they were stopped and told not to enter the hitting area because it was dangerous.  (Id. at pp. 35 & 45-46)

Paine admitted that the game of golf can be very dangerous.  (Id. at p. 25)  He agreed that a golf ball can travel at a high rate of speed, as high as 100 mph.  (Id.)  Paine also admitted that if a person gets hit by a golf ball they can be killed or seriously injured.  (Id. at pp. 25-26)

On the day of the accident, Plaintiff was injured when she was struck by a golf ball while standing at the far end of the net.  (Id. at p. 39)  According to Paine, Plaintiff did not alert anyone that she was entering the hitting area.  (Id. at p. 59)

## V.    The Students Knowledge of the Risk of Injury

### A.    Keiko Takeuchi

Keiko Takeuchi ("Keiko"), age 18, is a foreign-exchange student at SSMS.  (May 21, 2004 Deposition of Keiko Takeuchi, at pp. 5-6, attached as Ex. 10 to Haws Aff.)  She is Japanese, but understands English.  (Id.)

Keiko was involved in the elective golf class at SSMS during the 2002 to 2003 winter semester.  (Id. at pp. 11, 15 & 17)  The golf class was held every day beginning at 8:45 a.m. (Id. at pp. 18 & 20)  It took place in the gym.  (Id. at p. 30)

There was a net around the entire area where the golfers were instructed.  (Id.)  Six stations or mats were set up inside the net.  (Id.)  Students who were not practicing were required to wait outside the net.  (Id.)

According to Keiko the students were instructed on two safety rules from Paine.  (Id. at p. 21)  First, Paine instructed the students not to swing their club around any other student.  (Id. at pp. 21 & 65)  Second, Paine told the students not to go out into the hitting area where balls would be because students could be hit by a golf ball.  (Id. at p. 21)  Specifically, Paine told students "to be careful for the balls and then when somebody is hitting around you, you cannot go get the balls."  (Id. at p. 70)  He also said "when people are around don't go out because you'll get hit."  (Id. at p. 71)  Paine told the students not to go out in front of the hitting area because it was dangerous.  (Id. at p. 31)  Paine also informed the students that they could be injured if they got hit by a golf ball.  (Id. at p. 21)  Specifically, Keiko stated that Paine told the students to watch out for the balls because "if you get hit, it will be really big injured."  (Id. at p. 34)

Those safety instructions were given by Paine on the first day of class and periodically throughout the golf classes.  (Id. at pp. 20-21 & 23)  If Paine observed a student in the net area while other students were hitting golf balls, he would advise them not to do that again because it was dangerous.  (Id. at pp. 31, 35-36, 41 & 82)  It was obvious to Keiko that she could be hurt if she was hit by a golf ball.  (Id. at pp. 21-22)  In fact, Keiko admitted that Paine made it clear to the class that a student could be hurt if they were struck by a golf ball.  (Id. at p. 22)  According to Keiko, students would leave the net when they were done golfing because they knew it was dangerous to be in the net area.  (Id. at p. 46)

Paine also made sure that the students all knew and understood the safety rules.  (Id. at pp. 22 & 24)  According to Keiko, Lilian was present during Paine's safety

instructions.  (Id. at pp. 23-24)  Keiko admitted that all of the students in the golf class were expected to follow the safety rules.  (Id. at p. 22)

On the day of the accident, Keiko was golfing on the first mat.  (Id. at p. 43)  The mat next to her was empty.  (Id.)  Lilian was standing behind Keiko, on the third mat, hitting golf balls.  (Id. at pp. 43 & 48)  Max and Sorenson were also golfing inside the net.  (Id. at p. 44)  Paine was instructing Sorenson.  (Id.)

Keiko saw Lilian once she got into the net area.  (Id. at p. 48)  Lilian did not say anything to Keiko before she entered the hitting area.  (Id.)  She did not hear Lilian warn any of the other golfers that she was going to enter the hitting area either.  (Id. at p. 90)  Keiko stopped hitting her golf balls because she did not want to chance hitting and injuring Lilian.  (Id. at p. 49)  She observed Lilian close to the opposite side of the net, where balls would be hit, picking up golf balls by hand.  (Id. at p. 52)  Kieko did not see the actual accident.  (Id. at p. 53)  She simply saw Lilian lying down.  (Id.)

### B.  Hank Huang

Hsin Han Huang a/k/a Hank Huang is an 18-year-old Taiwanese student at SSMS.  (May 13, 2004 Deposition of Hank Huang, at pp. 3 & 5, attached as Ex. 11 to Haws Aff.)  Hank has attended SSMS for four years.  (Id. at p. 5)  He understands English very well.  (Id. at p. 4)

Hank participated in the SSMS elective golf class.  (Id. at pp. 11 & 14)  The class was held in the school's gymnasium.  (Id. at p. 14)  A 60-foot-wide by 30-foot-deep net was set up inside the gym with six golf stations.  (Id. at pp. 14-15)

The golf instructor, Paine, provided safety instructions on the first day of golf class.  (Id. at p. 15)  The students, including Lilian, were specifically told to be careful swinging a club when others are around.  (Id. at p. 15 & 36)  Students were also advised not to walk out into the hitting area while other students were hitting golf balls.  (Id. at p. 16)  Paine

informed the students that they could be hurt if they walked into the net while other students were hitting balls.  (Id.)  According to Hank, Paine made clear that if someone walked into the hitting area while other golfers were hitting they could be seriously injured.  (Id. at p. 27)  These safety instructions were repeated periodically through the course of the class.  (Id. at p. 16)

Golf classes were held daily.  (Id. at pp. 16-17)   Prior to Lilian's accident, the students had participated in approximately 20 golf classes.  (Id. at p. 16)  Each class lasted approximately 45 minutes. (Id. at p. 19)

Hank indicated that ball retrieval occurred either when Paine would advise all of the students to stop hitting so that the group could pick up the golf balls together or if a student advised the others in the net to stop hitting while they retrieved the balls.  (Id. at pp. 19-20)  Hank stated that students were not allowed to go and get golf balls while other students were still hitting.  (Id. at p. 20)  According to Hank, Paine specifically instructed against students retrieving balls while others were hitting.  (Id.)  Hank knew and understood this safety rule.  (Id. at pp. 20-21)  He also testified that the other students in the class followed this rule. (Id. at p. 21 & 26)  Hank remembered occasions when students would attempt to enter the hitting area to retrieve balls while others were still hitting. (Id. at p. 21)  On those occasions, Paine would instruct the student not to engage in that type of behavior because they could get hurt.  (Id.)  Paine's reprimand of the students for not following rules occurred in front of the entire class so that all of the students knew and understood the importance of following the safety rules.  (Id. at p. 27)

### C.    Chun Ho

Chun Ho a/k/a Frankie Ho is a nineteen year old senior at SSMS.  (May 13, 2004 Deposition of Chun Ho, pp. 3-4, attached as Ex. 12 to Haws Aff.)  He is a foreign student from Hong Kong.  (Id. at p. 5)

Frankie participated in the golf class held in the gymnasium of SSMS.  (Id. at pp. 8-9)  The class was held five days a week.  (Id. at p. 11)  The students attended approximately twenty classes prior to Lilian's accident.  (Id.)

 According to Frankie, the golf instructor taught the students safety rules to be followed in the class.  (Id. at p. 9)  Specifically, Paine taught the students to be careful swinging the golf club.  (Id. at p. 10 & 29)  Paine told the students not to swing a club if a student was in the swing path.  (Id. at p. 29)  He also instructed students not to walk out into the hitting area while other students were golfing.  (Id. at p. 10)  According to Frankie, these were all important safety rules.  (Id. at p. 52)

If golf balls had to be retrieved, Paine's rule was that students should not do so until the student asked for and received permission or an okay from Paine.  (Id.)  Students were reminded of Paine's safety rules periodically through the golf classes. (Id. at p. 30)  According to Frankie, the students were required to follow all of Paine's safety rules.  (Id. at p. 53)

Frankie does not recall any student attempting to pick up golf balls without first asking Paine's permission.  (Id. at p. 12)  He never observed any student attempt to retrieve balls while other students were hitting.  (Id.)  Rather, the students would wait for everyone to finish hitting before retrieving the golf balls in the net as a group.  (Id. at p. 14)  The students would retrieve balls together four or five times a class.  (Id.)

At the time of Lilian's accident, Frankie was sitting at the teacher's desk outside the net.  (Id. at p. 18)  Frankie recalls Max, Sorenson and Lilian as the students golfing inside the net prior to the accident.  (Id. at pp. 20-22)  The golf instructor was with Sorenson giving instruction.   (Id. at pp. 21-22)   Apparently, a student asked Paine if they could begin retrieving the golf balls.  (Id. at p. 38)  Paine replied, "just wait a moment, let me finish with

Luke [Sorenson] first."  (Id.)   In other words, the students were instructed not to retrieve balls just before Lilian's accident.  (Id. at pp. 55-56)

While Paine was positioning Sorenson, Lilian finished hitting her golf balls and "went out automatically like without thinking."  (Id. at pp. 23-24 & 39)   Frankie stated that Lilian walked out and grabbed a ball at the far end of the net when she was struck by a ball hit by Sorenson.  (Id.)

Frankie knew not to go out into the hitting area to grab a golf ball.  (Id. at p. 27)   He stated that Paine warned the students numerous times not to retrieve balls while other students were hitting.  (Id.)   That was a safety rule that was made clear to the students throughout the golf classes.  (Id. at pp. 27-28)   Frankie knew it was dangerous to be inside the hitting area of the net.  (Id. at p. 28)   He also knew that students could be hurt badly if they were struck by a golf ball.  (Id.)

## D.   Yu-Chun Chen

Yu-Chun Chen a/k/a Jill is an 18-year-old junior in her second year at SSMS. (May 13, 2004 Deposition of Yu-Chun Chen, at pp. 3 & 5, attached as Ex. 13 to Haws Aff.)  She is originally from Taiwan.  (Id. at p. 5)

Jill was friends with Lilian in Taiwan prior to coming to school at SSMS.  (Id. at pp. 13 & 32)   They remained friends when they came to SSMS together.  (Id. at p. 32) According to Jill, Lilian was a good student.  (Id. at p. 40)  She was a nice girl and not a rule breaker.  (Id. at pp. 40-41)

Jill participated in the elective golf class at SSMS.  (Id. at p. 9)  She recalls the instructor telling the students to be careful swinging their golf clubs so that they do not strike anyone in the area of their swing.  (Id. at pp. 11-12)  She does not remember whether Paine instructed the students about not walking into the hitting area while other students were hitting golf balls.  (Id. at p. 12)  She also does not remember being warned of the danger of

being struck by golf balls.  (Id. at p. 15)  However, Jill admitted that when she almost struck Keiko, who had gone to get some balls, she was reprimanded by Paine and told not to do that again because it was dangerous.  (Id. at pp. 16 & 35)  Jill therefore knew that retrieving golf balls from inside the net was dangerous if students were still hitting balls from the mats. (Id. at p. 17)

On the day of Lilian's injury, Jill was standing outside of the net and therefore did not see the accident.  (Id. at p. 27)

### E.    Luke Sorenson

Sorenson was a 6th grader at the time of Plaintiff's accident.  (June 30, 2004 Deposition of Lucas Sorenson, at p. 11, attached as Ex. 14 to Haws Aff.)  He participated in the elective indoor golf class held in the gymnasium at SSMS.  (Id. at pp. 8 & 26)

Sorenson indicated that the golf students were instructed by Paine to be careful where they were walking in the class.  (Id. at p. 9)  The students were instructed to be aware of other student's golf swings.  (Id. at pp. 10 & 27)  Paine taught the students not to strike a ball if someone was in the hitting area.  (Id. at p. 28)  They were also told to be sure everyone in the class knew when they were going out to retrieve golf balls. (Id. at p. 9)  This was done by advising Paine who would then stop the class.  (Id. at p. 14)  Paine would repeat these instructions to the students weekly.  (Id. at p. 10)  Sorenson believed that everyone in the class knew and understood the rules.  (Id. at pp. 14 & 25)  Except for the day of the accident, the students followed Paine's rules.  (Id. at p. 25)

Sorenson knew that a student could be hit by a golf ball if they were inside the net area.  (Id. at p. 14)  He also knew that a person could be badly hurt if they were struck by a golf ball.  (Id. at pp. 14-15)  In fact, Sorenson admitted that the students were told by Paine that they could be seriously injured in the golf class.  (Id. at p. 28)

According to Sorenson, the students would retrieve balls together as a class.  (Id. at pp. 9-10)  This would occur approximately 4 to 5 times a class.  (Id. at p. 11)  The students could also retrieve golf balls if they advised Paine and he said okay after stopping everyone else from swinging.  (Id. at pp. 21-24)  Paine would remind students not to go out and get balls if other students were still hitting.  (Id. at pp. 37-38)

On the day of the accident, Sorenson, Plaintiff and Max were golfing inside the net.  (Id. at p. 13)  The students remaining inside the net could both see and hear golf balls, which were being struck by each other, hit the net.  (Id. at p. 49)  Plaintiff had been receiving instruction from Paine prior to Sorenson's individual instruction.  (Id. at pp. 13 & 46)  Plaintiff was located approximately two mats from Sorenson.  (Id. at p. 40)

Next, Paine and Sorenson began working on Sorenson's back swing.  (Id. at pp. 18 & 33)  Sorenson had been having trouble slicing the ball for some time.  (Id. at p. 50)  Sorenson would address the ball, bring his club back, be put into position by Paine and swing when he was instructed.  (Id. at pp. 36 & 44)  Sorenson struck two to four balls prior to Plaintiff's accident.  (Id. at pp. 16 & 34)   Just prior to the accident, Sorenson sliced a ball into the right corner of the net.  (Id. at p. 51)  After he struck each ball, Sorenson followed his swing and observed no one in the net area.  (Id. at pp. 16, 17 & 54-55)

Sorenson does not recall Plaintiff saying anything prior to entering the net area.  (Id. at pp. 14 & 19)  He never saw Plaintiff in the net area before the accident.  (Id. at p. 15)  If he knew someone was in the net, he never would have hit a golf ball.  (Id. at p. 16)

Sorenson saw Plaintiff get hit by the golf ball he struck.  (Id. at p. 19)  She was retrieving golf balls near the end of the net in the right corner.  (Id. at pp. 18-19)  According to Sorenson, Plaintiff violated Paine's rule by being out in the net area retrieving golf balls without advising Paine while other students were still hitting balls.  (Id. at pp. 19-20)

## DOCUMENTS COMPRISING THE RECORD

- Complaint;

- Amended Complaint;

- Defendant's Answer to Amended Complaint;

- Plaintiffs' Answers to Defendant's Interrogatories;

- Plaintiffs' Supplemental Answers to Defendant's Interrogatories;

- Deposition Testimony of Keiko Takeuchi; Hank Huang; Chun Ho; Yu Chun Chen; Lucas Sorenson; Greg Paine; John Sumner; Nick Stoneman and Dennis Brown; and

- Affidavit of Daniel A. Haws

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(C).  The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden at trial.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  The summary judgment procedure is not disfavored, but is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  477 U.S. at 372, 106 S.Ct. at 2555.

In this case, the undisputed facts demonstrate there are no genuine issues of material fact as to Plaintiff's primary assumption of the risk of injury.  Accordingly, Defendant Paine is entitled to summary judgment as a matter of law.  Alternatively, this Court should dismiss Plaintiff's joint enterprise cause of action as there are no facts in

evidence that (1) Paine and SSMS ever had a mutual understanding for a common purpose; or (2) Paine ever had an equal right to a voice in the direction and control of the means used to carry out any common purpose.

## APPLICATION OF MINNESOTA LAW

This case is in Federal Court as a result of the diversity of citizenship of the parties. Accordingly, the Court should apply Minnesota's substantive law. *Erie R. Co. v. Thompkins*, 304 U.S. 64 (1938).

## DISCUSSION

### I.     Application of the Primary Assumption of the Risk Doctrine in Minnesota

In Minnesota, "[t]he doctrine of assumption of the risk applies to one who voluntarily exposes himself to a known and appreciated risk arising from another's negligence." *Parr v. Hamnes*, 228 N.W.2d 234, 237 (Minn. 1975). "The doctrine of primary assumption of the risk relates to a defendant's legal duty to protect a plaintiff from a risk of harm." *Jussila v. U.S. Snowmobile Ass'n*, 556 N.W.2d 234, 236 (Minn. Ct. App. 1996). "Minnesota law recognizes two types of assumption of the risk." *Andren v. White-Rodgers Co.*, 465 N.W.2d 102, 104 (Minn. Ct. App. 1991). "Primary assumption of the risk arises:

> Where parties have voluntarily entered a relationship in which plaintiff assumes well-known risks. As to those risks, the defendant has no duty to protect the plaintiff and, thus, if the plaintiff's injury arises from an incidental risk, the defendant is not negligent.

*Id.* Secondary assumption of the risk is a type of contributory negligence. *Id.*

"The elements of both primary and secondary assumption of the risk are whether a person had (a) knowledge of the risk; (b) an appreciation of the risk; and (c) a choice to avoid the risk but voluntarily chose to chance the risk."[2] *Id.* at 104-05. "The doctrine of

---

[2] *See also* JIG 136.

primary assumption of the risk defines the limits of a defendant's duty to the plaintiff." *Id.* at 105. "The manifestations of acceptance and consent dictate whether primary or secondary assumption of the risk is applicable in a given case." *Id.* at 105.

In summary, "[t]he doctrine of primary assumption of the risk defines the limits of a defendant's duty to the plaintiff." *Id.* "By voluntarily entering into a situation where the defendant's negligence is obvious, the plaintiff accepts and consents to it and agrees 'to undertake to look out for himself and relieve the defendant of the duty.'" *Id.*, *citing*, W. Keeton, D.Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts*, § 68, at 485 (5th Ed. 1984). "Primary assumption of risk is an absolute bar to the plaintiff's recovery." *Maras v. City of Brainerd*, 502 N.W.2d 69, 79 (Minn. Ct. App. 1993).

"A court may determine the applicability of the doctrine as a matter of law when reasonable people can draw only one conclusion from undisputed facts." *Jussila*, 556 N.W.2d at 236; *see also Andren*, 465 N.W.2d at 105 (holding that "[w]hen the facts are undisputed and reasonable people can draw only one conclusion, assumption of the risk is a question of law for the court.").

The case of *Walk v. Starkey Machinery, Inc.*, 180 F.3d 937 (8th Cir. 1999), illustrates how the doctrine of primary assumption of the risk applies in Minnesota. In *Walk*, the plaintiff, a clay loader or mixer, responsible for mixing twenty to thirty batches of clay per day, had his arm amputated after it became entangled in the auger while he was cleaning a pug mill trough. *Id.* at 938. The 8th Circuit Court affirmed the district court's grant of summary judgment to the manufacturer of the pug mill on the ground that Walk primarily assumed the risk of injury. *Id.*

In *Walk*, the court recognized that Walk knew and appreciated the risk of injury because he had been working as a clay loader for ten months. *Id.* at 939-40. He knew that

cleaning the pug mill while the auger was running was dangerous. *Id.* Walk also knew that the auger was capable of injuring him if it was running. *Id.* at 940. In fact, his fingers had been nicked on two previous occasions when he was cleaning the pug mill trough while the auger was running. *Id.* The court also concluded that Walk voluntarily chose to accept the risk of injury even though he had a chance to avoid it by placing his hand in the trough knowing that the auger was engaged and that the moving blades posed a risk of injury. *Id.*

As in *Walk*, summary judgment was granted to defendants, the manufacturer and retailer of a liquid propane gas tank, in a case involving a plaintiff, Andren, who was injured during an explosion of propane gas at his cabin. *Andren*, 465 N.W.2d at 104. Andren, the owner of a cabin which was heated by liquid propane (LP) gas, had no formal training with LP gas appliances, but had installed more than 100 LP gas heaters, including the one in his cabin. *Id.* In January 1985, Andren smelled LP gas in his basement when he went to check on his cabin. *Id.* "Andren discovered the smell of the gas grew stronger as he walked further into the basement." *Id.* He tried to open the basement windows to air out the room, but the windows were jammed. *Id.* Before leaving the basement to get a screwdriver to pry open the windows, he lit a cigarette. *Id.* The LP gas exploded, and Andren was severely burned. *Id.*

The *Andren* court concluded that "Andren primarily assumed the risk of an explosion when he lit a cigarette in a room filled with LP gas." *Id.* at 106. The court ruled that summary judgment was justified because all three elements of primary assumption of the risk were present. *Id.* at 105. "First Andren demonstrated his knowledge of the risk by testifying he knew LP gas was dangerous and was specifically aware that lighting a cigarette in a room filled with LP gas would cause an explosion." *Id.* Second, the record showed that Andren "appreciated the risk because he recognized the smell of LP gas in the

basement, and knew he should not light a cigarette while he was in the basement." *Id.* "Finally, the evidence is clear Andren had a choice to avoid the danger by not smoking, yet he voluntarily chose to light the cigarette." *Id.* Based on Andren's admissions, the appellate court held that Andren's lighting of a cigarette in a gas-filled room was a voluntary acceptance of a known danger that relieved defendants of any duty as Andren was in an equal position to protect himself. *Id.*; *see also Goodwin v. Legionville Sch. Safety Patrol Training Ctr.*, 422 N.W.2d 46, 48, 50 (Minn. Ct. App.), *pet. for rev. denied*, (Minn. 1988) (primary assumption of the risk applied to individual experienced in shingling who was injured when she fell off the roof as she knew hazards of roofing yet volunteered to participate in a roofing project).

## II.  The Primary Assumption Of The Risk Doctrine Applies When A Plaintiff Is Injured In An Inherently Dangerous Sporting Event

"The doctrine of primary assumption of risk has been held to apply in cases involving patrons of 'inherently dangerous' sporting events." *Jussila*, 556 N.W.2d at 236. The Minnesota Supreme Court has applied the doctrine of primary assumption of the risk to baseball, skating, hockey and golf. *Id.* at 237. The Minnesota Court of Appeals has applied the doctrine to a variety of other dangerous sporting activities.

To illustrate, in *Jussila,* a spectator was injured when he was struck by a snowmobile at a racing event. 556 N.W.2d at 235. He sued the sponsors and organizers of the event alleging negligence. *Id.* The district court granted summary judgment to the sponsors and organizers of the event on the ground that the doctrine of primary assumption of the risk barred the spectator's claim. *Id.*

The plaintiff, in *Jussila*, was a longtime recreational snowmobile rider. *Id.* at 236. He attended snowmobile racing events at the Crow Wing County Fairgrounds as a spectator for either two or three prior winters. *Id.* On the day of the incident, the plaintiff watched the

races from a ten-foot-high snow pile near the northwest turn because the grandstand bleachers were almost full. *Id.* As he watched the races from the snow pile, he witnessed two incidents in two separate races in which snowmobiles left the track around the northern curves, causing spectators standing below the plaintiff to quickly move from their positions in order to avoid being hit. *Id.* After one of these incidents, Jussila commented to a man next to him, "Where are we going to go if one comes up the snow bank or comes up the hill?" *Id.* Because of these incidents, Jussila decided to leave the snow pile location. *Id.* He moved to the south of the grandstand and briefly positioned himself between a travel trailer and a motor home parked alongside the track. *Id.* "When a person in the travel trailer asked him to move, Jussila began walking south, between the trailer and the track." *Id.* "There he was struck by a racing snowmobile that had left the track." *Id.*

On appeal, the court concluded that Jussila primarily assumed the risk of injury as a matter of law. *Id.* at 237. Jussila testified that he witnessed snowmobile racers lose control on "numerous" occasions. *Id.* On the day of the incident, he twice observed snowmobiles leave the racetrack around turns in the track. *Id.* At no point in time did he ever attempt to watch the races from the protected grandstand area. *Id.* Rather, he was injured when he was moving toward the southwestern curve of the track. *Id.* The court ruled that Jussila's knowledge of the risk of injury from a snowmobile leaving the racetrack was sufficient for him to have primarily assumed the risk of injury. *Id.*

More recently, the Minnesota Court of Appeals, in *Alwin v. St. Paul Saints Baseball Club*, 672 N.W.2d 570 (Minn. Ct. App. 2003), affirmed the trial court's grant of summary judgment to a ballpark sued by a spectator, who was struck in the mouth by a baseball, at a professional ball game, while returning to his seat from the restroom. *Id.* at 571. The spectator, in *Alwin*, was a baseball fan, who had been to many games in his lifetime and

who understood the risk of being hit by a foul ball while viewing the game.  *Id*. at 574.  The court of appeals concluded that a spectator at a professional baseball game assumes the inherent risk of being struck by a foul ball.  *Id*. at 572-74.  The *Alwin* court went on to state that "[b]ecause Alwin primarily assumed the risk as a spectator of an inherently dangerous sport, he cannot recover damages for his injuries when he was struck by a foul fly ball while returning to his seat from the restroom."  *Id*. at 574.

Like the spectator in *Alwin*, a participant, in an inherently dangerous sporting activity, may also have his or her claims barred by the primary assumption of the risk doctrine.  For example, the Minnesota Court of Appeals concluded that a player shot in the eye during a game of paintball primarily assumed the risk of injury when he played the game without eye protection.  *See Schneider v. Erickson*, 654 N.W.2d 144, 146 (Minn. Ct. App. 2002).  In reaching this holding, the *Schneider* court reasoned that the injured player had knowledge and appreciation of the risk of injury even though he had never actually played the game before the day of the accident because he knew that a person could be injured if he was hit in the eye with a paintball.  *Id*. at 150.  The injured player, in *Schneider*, knew that people wear eye protection to prevent injuries from paintballs.  *Id*.  He understood that eye protection should be worn at all times while playing paintball.  *Id*.  In fact, he wore eye protection when he started playing the game to protect his eyes from injury, but later removed the eye protection when it began getting dark outside.  *Id*.

In addition to concluding that the injured player knew and appreciated the risk of injury, the *Schneider* court also found that the injured player had the chance to avoid the risk, but voluntarily chose to take the risk of injury.  *Id*.  Specifically, the court reasoned that the injured player had a pair of goggles he could have worn, but simply chose not to.  *Id*.  In other words, he "had a choice to avoid the risk of being hit in the eye with a paintball, but voluntarily chose to take the risk."  *Id*.  Based on the undisputed facts, the court ruled that

the injured paintball player consented to relieve his co-player of his duty of care because he voluntarily chose to play paintball without eye protection while knowing that getting hit in the eye with a paintball was an inherent risk of the game. *Id*. at 151.[3]

In summary, Minnesota courts have routinely applied the doctrine of primary assumption of the risk to spectators and participants in dangerous sporting events because the spectators and participants assume well-known, inherent risks and thereby consent to relieve sponsors of and other participants in the sporting events of their duty of care with regard to those inherent risks.

### III. The Doctrine Of Primary Assumption Of The Risk Applies To Participants And Spectators Of Golf

The Minnesota Supreme Court, in *Grisim v. TapeMark Charity Pro-Am Golf Tournament*, 415 N.W.2d 874 (Minn. 1987), concluded that a spectator struck in the eye by an amateur golfer's hooked tee shot primarily assumed the risk of injury. *Id*. at 875-76. The spectator, in *Grisim*, sat down under a tree to the left of the green on the 18th hole after seeing that the bleachers behind the green were crowded. *Id*. at 875. As a result of his injury, the spectator sued Koechler, an amateur golfer playing in a charity tournament. *Id*. "The trial court granted summary judgment on the basis of the primary assumption of the risk doctrine." *Id*. Specifically, the trial court concluded that Grisim, in choosing to sit under

---

[3] *See also Brisson v. Minneapolis Baseball & Athletic Ass'n*, 185 Minn. 507, 240 N.W. 903 (1932) (concluding that spectator sitting in temporary seats behind third base line assumed the risk of injury from foul balls); *Modec v. City of Eveleth*, 224 Minn. 556, 562, 29 N.W.2d 453, 456 (1947) (upholding summary judgment on ground that spectator hit by a hockey puck at a hockey game assumed the risks incident to the game); *Moe v. Steenberg*, 275 Minn. 448, 450, 147 N.W.2d 587, 588-89 (1966) (concluding that ice skater assumed the risk of injury when she was fallen on by another skater as she was trying to get up after having fallen down while skating); *Swagger v. City of Crystal*, 379 N.W.2d 183, 184-85 (Minn. Ct. App. 1985), *pet. for rev. denied*, (Minn. 1986) (holding that patrons of baseball games assume the risk of injury from thrown or batted balls when they sit in an unprotected seat; no adult of reasonable intelligence could fail to recognize the risk of this type of injury); *Wagner v. Thomas J. Obert Enterprises*, 396 N.W.2d 223, 226 (Minn. 1986), *quoting*, *Moe v. Steenberg*, 147 N.W.2d 587, 589 (Minn. 1966) (approving "statement that a patron of a roller-skating rink assumes the ordinary, necessary, obvious risks that are incidental to roller-skating, including the risk of falling and colliding with other skaters due to lack of skill or clumsiness").

the tree instead of in the designated area behind the green, assumed those risks inherent in a golf tournament, including being hit by an errantly struck ball. *Id*. The Minnesota Supreme Court affirmed the trial court concluding that Grisim's claim against Koechler was barred by the primary assumption of the risk doctrine because she assumed the risks of straying too close to the playing area. *Id*. at 875-76.

Like the Minnesota Supreme Court, in *Grisim*, numerous courts in jurisdictions across the country have also applied the doctrine of primary assumption of the risk to golf spectators and participants injured by a golf club or an errantly struck golf ball. To illustrate, in *Havens v. Kling*, 277 A.D.2d 1017, 715 N.Y.S.2d 812 (N.Y. App, Div., 2000), 11-year old John Havens was injured while participating in a junior golf program. *Id*. at 813. Specifically, Havens was hit in the head with a golf club as he stood behind his 12-year old cousin, Kraft, who was taking a practice swing. *Id*. Summary judgment was granted to Kraft's mother based on Haven's primary assumption of the risk since Haven conceded that he was aware of the potential for injury from a person swinging a golf club. *Id*. at 813-14; *see also Griffin v. Lardo*, 247 A.D.2d 825, 668 N.Y.S.2d 837 (N.Y. App. Div. 1998) (concluding that 12-year old inexperienced golfer struck in the head by a golf club voluntarily assumed the risk of injury when she stood too close to 11-year old defendant while she showed defendant how to swing a golf club).

In *Bundschu v. Naffah*, 147 Ohio App.3d 105, 768 N.E.2d 1215 (Ohio Ct. App. 2002), Bundschu was injured at a driving range when a ball he sliced ricocheted off a fence pole and hit his eye. *Id*. at 1216-17. The fence pole and fencing at the west end of the driving range was installed to protect golfers to the west of the driving range from getting hit with slices from golfers in the tee boxes on the driving range. *Id*. at 1217.

23

Bundschu sued the owners of the driving range alleging that they were negligent in their placement of the fence pole. *Id.* at 1217. The court granted summary judgment to the owners of the driving range based on the doctrine of primary assumption of the risk. *Id.* at 1222. In reaching its decision the court, in *Bundschu*, reasoned that "[a] person who uses a driving range should expect that some precautions are used to prevent errant balls from hitting non-participants. That an errant ball is deflected back into the participant's playing field, rather than into an area with non-participants, should be considered part of the inherent risk of the sport." *Id.*

Similarly, in *Thompson v. McNeill*, 53 Ohio.St.3d 102, 559 N.E.2d 705 (Ohio 1990), Thompson was standing twelve to fifteen yards from McNeill on the fairway when McNeill shanked her shot toward Thompson. *Id.* at 706. The ball struck Thompson in her right eye. *Id.* The court granted summary judgment to McNeill concluding as follows:

> Shanking the ball is a foreseeable and not uncommon occurrence in the game of golf. The same is true of hooking, slicing, pushing or pulling a golf shot. We would stress that "[i]t is well known that not every shot played by a golfer goes to the point where he intends it to go. If such were the case, every player would be perfect and the whole pleasure of the sport would be lost. It is common knowledge, at least among players, that many bad shots must result although every stroke is delivered with the best possible intention and without any negligence whatsoever." (Citation omitted).

*Id.* at 709.

Just like the courts in *Thompson* and *Bundschu*, the court, in *Gyuriak v. Millice*, 775 N.E.2d 391 (Ind. Ct. App. 2002), granted summary judgment against Gyuriak, a golfer injured while standing in the rough on the third hole after being struck in the head by a golf ball hit by Millice, a player teeing off from the adjacent second hole. *Id.* at 393 & 395. In determining that Gyuriak's negligence claim was barred by the assumption of the risk doctrine, the court recognized that "the risk to a golfer of being struck by an errantly but otherwise appropriately-hit ball when playing, however, minimal, is an inherent and

reasonably foreseeable aspect of the game of golf, and that golfers assume that risk in the primary sense by choosing to play the game." *Id.* at 396. The court therefore ruled that "the risk of Millice accidentally shanking his ball and striking Gyuriak while Gyuriak was in the rough between the two holes was an inherent and reasonably foreseeable danger associated with the game of golf, and that Gyuriak accordingly assumed that risk as a matter of law." *Id.*; *see also American Golf Corporation v. Superior Court*, 79 Cal.App.4[th] 30, 93 Cal.Rptr.2d 683, 685-86 & 689 (Cal. Ct. App. 2000) (granting summary judgment against Becker, who was injured after co-player, Christopherson, hooked his golf ball to the left, striking a wooden yardage marker which resulted in the ball ricocheting off the yardage marker and into Becker's eye, on ground that "errant shots are an inherent risk of golf and errant shots by definition take flight in unintended directions, golf involves the very real possibility that a player will hook or slice a ball, the ball will strike a hard obstacle, and the ball will ricochet forcibly."); *Dilger v. Moyles*, 54 Cal.App.4[th] 1452, 1454-55, 63 Cal.Rptr.2d 591 (Cal. Ct. App. 1997) (concluding that golf is an active sport to which the doctrine of primary assumption of the risk applies since "[h]itting a golf ball at a high rate of speed involves the very real possibility that the ball will take flight in an unintended direction. If every ball behaved as the golfer wished, there would be little 'sport' in the sport of golf. That shots go awry is a risk that all golfers, even the professionals, assume when they play.")

## IV.   Defendant Paine Is Entitled To Summary Judgment In This Case Because Plaintiff Assumed The Primary Risk Of Injury

Just like the plaintiffs in the inherently dangerous sporting cases discussed, in detail, above, Plaintiff primarily assumed the risk of injury when she left her golf mat and entered the driving range inside the net to retrieve golf balls while other students were still practicing their golf swing. As demonstrated below, each element of the primary assumption of the

risk doctrine is satisfied and relieves Paine of any duty to Plaintiff because she knew of the danger, appreciated the danger, had a chance to avoid the danger, but voluntarily chose to chance the risk.

### A.  Plaintiff had Knowledge of the Danger

Paine instructed the golf students not to walk out in front of fellow students who were hitting golf balls.  (Paine Depo. at pp. 21-22 & 30-31, attached as Ex. 1 to Haws Aff.; see also Huang Depo. at pp. 15-16, attached as Ex. 11 to Haws Aff.)  Students were also instructed not to walk out and retrieve golf balls from inside the hitting net while others were still golfing.  (Paine Depo. at pp. 35 & 45-46; see also Ho Depo. at pp. 10 & 27, attached as Ex. 12 to Haws Aff.)  If a student tried to get a ball inside the net while other students were still hitting, they were stopped and told not to enter the hitting area because it was dangerous.  (Paine Depo. at pp. 35 & 45-46.; see also Takeuchi Depo. at pp. 31, 35-36, 41 & 82, attached as Ex. 10 to Haws Aff.; Huang Depo. at pp. 20-21 & 27, attached as Ex. 11 to Haws Aff.; Chen Depo. at pp. 16 & 35, attached as Ex. 13 to Haws Aff.)

Prior to Plaintiff's accident, the students had participated in approximately 20 golf classes lasing 45 minutes each.  (Huang Depo. at pp. 16 & 19; see also Ho Depo. at p. 11, attached as Ex. 12 to Haws Aff.)  During these golf classes, Paine periodically repeated his safety instructions to the students.  (Ho Depo. at pp. 27, 28 & 30; Huang Depo. at p. 16; see also Takeuchi Depo. at pp. 20-21 & 23)

The undisputed evidence from the golf instructor and students demonstrates that Plaintiff had knowledge of the danger of walking out and retrieving golf balls from inside the net area while other students were still hitting golf balls.

### B.  Plaintiff Appreciated the Danger

The golf students were told not to go out into the hitting area where balls would be because students could be hit by a golf ball.  (Takeuchi Depo. at p. 21, attached as Ex. 10

to Haws Aff.)  Paine warned students "to be careful for the balls and then when somebody is hitting around you, you cannot go get the balls."  (Id. at p. 70)  Paine said "when people are around don't go out because you'll get hit."  (Id. at p. 71)  Paine also informed students not to go out in front of the hitting area because it was dangerous.  (Id. at p. 31)  He told the students that they could be seriously injured if they were hit by a golf ball.  (Id. at pp. 21 & 22)  In fact, Paine specifically warned the students that they could be hurt and seriously injured if they walked into the net while other students were hitting golf balls.  (Huang Depo. at pp. 16 & 27, attached as Ex. 11 to Haws Aff.; see also Ho Depo. at pp. 28, attached as Ex. 12 to Haws Aff.)

Students admittedly knew that it was dangerous to retrieve golf balls from inside the net while other students were still hitting balls from the mats.  (Chen Depo. at p. 17, attached as Ex. 13 to Haws Aff.)  The students also admittedly knew that if they got hit "it will be really big injured."  (Takeuchi Depo. at p. 34, attached as Ex. 10 to Haws Aff.)  In fact, it was obvious to the students that they could be badly hurt if they were hit by a golf ball.  (Id. at pp. 21-22; Ho Depo. at pp. 27-28, attached as Ex. 12 to Haws Aff.)

Based on the undisputed evidence from the golf class students, it is clear that Plaintiff appreciated the risk of being hit and seriously injured by a golf ball if she was inside the net area while other students were still golfing.

### C.     Plaintiff had the Opportunity to Avoid the Danger, But Willingly Chose to Chance the Risk

Prior to Plaintiff's accident, Paine was instructing Sorenson.  (Ho Depo. at pp. 20-22)  A fellow student asked Paine if they could begin retrieving golf balls.  (Id. at p. 38)  Paine replied "just wait a moment, let me finish with Luke [Sorenson] first."  (Id.)  In other words, the students were instructed not to retrieve golf balls inside the net immediately before Plaintiff's accident.  (Id. at pp. 38 & 55-56)

Despite this warning, Plaintiff, who had finished hitting her golf balls, entered the hitting area of the net "without thinking" to retrieve golf balls while other students were still golfing.  (Id. at pp. 23-24 & 39; see also Takeuchi Depo. at pp. 43-44, 48-49 & 52-53, attached as Ex. 10 to Haws Aff.)  Plaintiff did not advise anyone that she was entering the hitting area of the net to retrieve golf balls.  (Paine Depo. at p. 59, attached as Ex. 1 to Haws Aff.; see also Takeuchi Depo. at p. 90)  She did not wait outside the net area until after the other students had finished golfing either.  (Takeuchi Depo. at pp. 30 & 46)  Nor did she wait to retrieve balls as a group (with the other students) until after everyone had completed golfing.  (Ho Depo. at pp.12, 14 & 52)

This undisputed evidence demonstrates that Plaintiff had numerous opportunities to avoid the risk of injury by either leaving the net area after she completed hitting her balls or waiting until all the other students had finished golfing before retrieving golf balls.  In fact, fellow student Frankie testified that Paine specifically warned all of the students to wait to retrieve golf balls until after Sorenson had finished golfing.  Despite Paine's instruction, Plaintiff chose to chance the risk of injury by leaving her mat and entering the hitting area to retrieve golf balls while Sorenson and possibly two other students, Keiko and Max, were still golfing.  Obviously, Plaintiff had the opportunity to avoid the danger of being struck by a golf ball, but willingly chose to chance the risk of being injured by an errantly struck ball when she entered the netting area to retrieve her golf balls while other students were still hitting balls from the mats.

Because the undisputed evidence establishes that Plaintiff voluntarily chanced a known and appreciated risk of injury, all three of the elements of primary assumption of the risk are satisfied in this case. Defendant Paine is therefore entitled to summary judgment and a dismissal of Plaintiffs' Complaint as a matter of law.

**V.     Summary Judgment On Plaintiff's Joint Enterprise Claim Should Also Be Granted**

Whether joint enterprise exists is a question of law.  *Olson v. Ische*, 343 N.W.2d 284 (Minn. 1984); *see also Weber v. Goetz,* 371 N.W.2d 611, 616 (Minn. Ct. App. 1985).   In order to establish a joint enterprise claim in Minnesota, two elements must be present: (1) a mutual understanding for a common purpose; and (2) an equal right to a voice in the direction and control of the means used to carry out the common purpose.  *Ruth v. Hutchinson Gas Co.*, 209 Minn. 248, 296 N.W. 136 (1941); *see also* CᴵᴠJᴵɢ 30.65 (noting that a joint enterprise exists when "[t]wo or more persons have a mutual understanding for a common purpose, and [e]ach has a right to a voice in the direction and control of the means used to carry it out.").

Summary judgment is appropriately granted on claims of joint enterprise when there is either no mutual understanding for a common purpose or an equal right to a voice in the direction and control of the means used to carry out the common purpose.  *See Leuer v. Johnson*, 450 N.W.2d 363 (Minn. Ct. App. 1990).  Plaintiffs, in this case, can satisfy neither element of their joint enterprise cause of action.  As such, Defendant Paine is entitled to judgment on this claim as a matter of law.

**A.     Paine and SSMS had no Mutual Understanding for a Common Purpose**

Plaintiffs cannot satisfy the first element necessary to prove joint enterprise as Paine and SSMS had no mutual understanding for a common purpose.  Stated another way, Paine and SSMS were acting for separate reasons.  Where two or more persons act together for their own separate reasons, no joint enterprise exists.  *See Pierson v. Edstrom*, 174 N.W.2d 712, 714 (Minn. 1970), *citing, Christensen v. Hennepin Transp. Co.,*10 N.W.2d 406 (Minn. 1943); *see also Sherman v. Korff*, 91 N.W.2d 485 (Mich. 1958).

In *Sherman*, a husband and his mother desired to go on a fishing trip. *Id.* at 488. The husband's wife drove her husband and his mother to the fishing destination. *Id.* Sometime during the trip an accident occurred and the husband was injured. *Id.* at 486. Suit was commenced by the husband to recover for his injuries against a negligent third party. *Id.* The negligent third party argued that the husband's claim was barred due to the contributory negligence of his wife which he argued should be imputed to the husband under a joint enterprise theory. *Id.* The Supreme Court of Michigan disagreed. *Id. at 488.* The court noted that the husband and wife shared the common purpose of driving to the fishing destination. *Id.* However, the purpose of the trip was for fishing. Only the husband and his mother intended to go fishing. *Id.* "[T]he wife seems merely to have gone along for the ride." *Id.* The court therefore held that no common purpose existed between the husband and wife. *Id.*

Like the wife in *Sherman*, Paine merely went "along for the ride" in this case. Specifically, SSMS, not Paine, decided to offer golf class for its students. (Brown Depo. at pp. 25 & 35, attached as Ex. 3 to Haws Aff.; Sumner Depo. at pp. 5, 20 & 26-27, attached as Ex. 2 to Haws Aff.; Paine Depo. at pp. 13-14, attached as Ex. 1 to Haws Aff.) According to SSMS, the purpose of the golf class was to provide an enrichment course that would benefit their students and round out their development and educational experiences. (Brown Depo. at pp. 15-20; Sumner Depo. at pp. 5, 20 & 26)

Paine, a golf pro at a local golf course, accepted the position to teach an elective winter golf class at the school, not to round out unknown students' development and educational experiences, but for his own personal financial reasons. Paine was paid $1,500.00 upon completion of the course. (Paine Depo. at p. 55) Paine only helped institute the SSMS golf program after he was verbally offered money for his teaching services. (Id.; see also Sumner Depo. at pp. 51-52) It is apparent that the main purpose of

Paine's acceptance of the teaching position was to make money, not to round out or benefit the development or educational experiences of SSMS students.  Clearly, Paine and SSMS shared no common purpose that rises to the level of creating a joint enterprise.

**B.     Paine and SSMS were not Engaged in a Joint Enterprise as Paine Possessed no Equal Right of Control or Management**

In order to establish a joint enterprise, each participant must have an equal right to direct and govern the movements and conduct of every other participant with respect to the mutual undertaking.  *See Delgado v. Lohmar*, 289 N.W.2d 479, 482 (Minn. 1980).  The sharing of expenses is a factor Minnesota courts have routinely considered persuasive in finding an equal right to direct and control the conduct of every member of an alleged joint enterprise.  *See Ruth,* 296 N.W.2d at 141; *see also Delgado*, 289 N.W.2d 483 (where the court found the defendants were not engaged in a joint enterprise and noted that the defendants did not share in any of the expenses); *Feeser v. Emery*, 134 N.W.2d 23 (Minn. 1965) (joint enterprise recognized in a group trip where all occupants of the car shared in the expenses associated with the trip); *Murphy v. Keating*, 283 N.W. 389 (Minn. 1939) (same).

To illustrate, in *Murphy,* school teachers made a trip in an automobile for the purpose of a vacation.  *Id.* at 391.  After an accident, a question arose as to whether the school teachers were engaged in a joint enterprise.  *Id.* at 392.  The court held that a joint enterprise existed because the owner of the automobile furnished the automobile and the others shared gasoline, oil, and garage expenses during the trip.  *Id.*

Unlike the teachers in *Murphy*, Paine did not share in the expenses involved with the golf program in this case.  (Brown Depo. at pp. 30-31 & 33)  It is undisputed that SSMS purchased all of the golf equipment for the golf class.  (id.)  Paine provided <u>no</u> money to SSMS for its golf program.  (Id.)  In short, Paine did not share in any of the expenses

associated with teaching the course.[4]   (Id.)   Under *Ruth, Delgado and Murphy*, SSMS's complete control over the finances involved with the golf program provides strong proof that Paine did not possess an equal right to direct or govern the conduct of SSMS in providing an enrichment course to round out its students' development and educational experiences.

Paine's lack of control over the golf class is evident for other reasons as well. Head Master Dennis Brown hired Paine to teach golf to SSMS students.   (Paine Depo. at p. 14, attached as Ex. 1 to Haws Aff.; see also Brown Depo. at pp. 26 & 48, attached as Ex. 3 to Haws Aff.; Sumner Depo. at pp. 29-32, attached as Ex. 2 to Haws Aff.)   Paine reported to Head Master Brown.   (Paine Depo. at p. 14)   Paine was supervised twice weekly by SSMS's Athletic Director Sumner.   (Sumner Depo. at p. 53)   SSMS admitted that they had the authority to change how Paine was teaching the golf class.   (Id. at p. 53)   SSMS also had the ability to make any safety modifications to the golf class taught by Paine at SSMS. (Id. at p. 57; Stoneman Depo. at pp. 17-18, attached as Ex. 4 to Haws Aff.)   Clearly, the control over the equipment purchased, the safety instructions provided and the manner in which Paine taught the golf class was controlled by SSMS and not by Paine.

Further, the decision on when the golf class would be scheduled was SSMS's and not Paine's.   (Paine Depo. at p. 15, attached as Ex. 1 to Haws Aff.)   SSMS also requested that Paine locate a dual purpose net to be used for the school's golf class and other sporting activities.   (Id. at pp. 26 & 44-45; see also Sumner Depo. at pp. 44-45 & 64)   The dual purpose net selected by Paine had to be approved by SSMS's Athletic Director Sumner before it was purchased by the school.   (Sumner Depo. at p. 65)

Simply put, Paine offered, at the request of SSMS, his golfing knowledge to help SSMS make informed decisions about its golfing program and the equipment SSMS wished

---

[4] In fact, Paine, himself, was an expense of the golf class borne solely by SSMS.   SSMS decided how much to pay Paine and when he would be compensated.   (Paine Depo. at p. 55)

to purchase.  No court to Paine's knowledge has ever found a joint enterprise to exist where an individual merely performs his job responsibilities as Paine performed in this case. Because Paine only performed his job responsibilities, subject to the supervision and control of SSMS, it is clear that Paine did not possess an equal right in the control and management of SSMS's golf program, the golf facility, or the golf equipment ultimately purchased by SSMS.  Accordingly, Plaintiffs' joint enterprise claim fails as a matter of law.

## CONCLUSION

As demonstrated above, each and every element of the doctrine of primary assumption of the risk has been satisfied in this case.  Plaintiff Lilian Wu knew and appreciated the danger of being struck and injured by an errantly hit high speed golf ball, yet she voluntarily chose to leave her position of safety on the golf mat and enter the driving range inside the golf net to retrieve golf balls while other students were still practicing their golf swing.  This conduct is the epitome of primary assumption of the risk in an inherently dangerous sporting activity.  Accordingly, Defendant Greg Paine respectfully requests that this Court grant his Motion for Summary Judgment and enter an Order dismissing Plaintiff's Complaint with prejudice.

Alternatively, Defendant Paine requests that the Court grant his Partial Motion for Summary Judgment on Plaintiffs' joint enterprise cause of action since there is no evidence in the record to support such a claim as a matter of law.

Dated: November 19, 2004            **MURNANE, CONLIN, WHITE & BRANDT**


                                    S/Daniel A. Haws
                                    Daniel A. Haws #193501
                                    Stacy E. Ertz #0267181
                                    Attorneys for Defendant Greg Paine
                                    444 Cedar Street, Suite 1800
                                    St. Paul, MN  55101
610570.1                            (651) 227-9411